Dwight Yellen (DY 6547)
Michael J. Sheppeard (MS 9115)
**BALLON STOLL BADER & NADLER, P.C.**
729 Seventh Avenue – 17th Floor
New York, NY 10019
        +
505 Main Street
Hackensack, NJ 07601
212.575-7900
Fax 212.764-5060
www.ballonstoll.com
*Attorneys for Debtor and Debtor-in-Possession*
 Against All Odds USA, Inc.

**UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY**

-------------------------------------------------------x
*In re:*                                              Chapter 11

AGAINST ALL ODDS USA, INC.,                          Case No. 09-10117 (DHS)

                                                     TIN: 22-3391747

                        Debtor and
                        Debtor-in-Possession.        **Proposed Hearing Dates:**

                                                     **Bidding Procedures Motion
                                                     Hearing:
                                                     [May 4, 2009, at 2:00 p.m., EDT]**

                                                     **Sale Approval Hearing:
                                                     [May 21, 2009, at 10:00a.m., EDT]**

-------------------------------------------------------x

**VERIFIED APPLICATION IN SUPPORT OF THE DEBTOR'S MOTION FOR
AN ORDER PURSUANT TO SECTIONS 105(a), 363 AND 365 OF THE BANKRUPTCY CODE
AND BANKRUPTCY RULES 6004 AND 6006 (I) APPROVING PROCEDURES IN
CONNECTION WITH THE SALE OF ALL OR SUBSTANTIALLY ALL
OF THE DEBTOR'S ASSETS, (II) AUTHORIZING THE DEBTOR TO ENTER
INTO STALKING HORSE AGREEMENT IN CONNECTION THEREWITH,
(III) APPROVING PAYMENT OF A BREAK-UP FEE, AND (IV)
SETTING RELATED AUCTION AND SALE HEARING DATES**

TO:    Honorable Donald H. Steckroth
       United States Bankruptcy Judge

The Verified Application of Against All Odds USA, Inc., the within debtor and debtor-in-possession (the "**Debtor**"), by and through its attorneys, Ballon Stoll Bader & Nadler, P.C., respectfully represents:

I.

**INTRODUCTION**

1.      This Verified Application is submitted in support of the Debtor's motion (the "**Sale Motion**") for entry of orders pursuant to §§ 105, 363 and 365 of chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") and Rules 6004 and 6006 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") (A) (i) approving procedures (the "**Bidding Procedures**") in connection with the sale of all or substantially all of the Debtor's assets (the "**Assets**"), (ii) authorizing the Debtor to enter into an Asset Purchase Agreement (the "**APA**") with New Deal LLC (the "**Prospective Purchaser**") in connection therewith, (iii) approving the payment of a break-up fee (the "**Break-Up Fee**") on the terms and conditions set forth in the APA, and (iv) the setting of related auction and sale hearing dates; and (B) (i) approving the sale of the Assets free and clear of all interests, including all liens, claims and encumbrances; (ii) authorizing the assumption and assignment of certain Agreements (hereinafter defined); and (iii) approving certain related relief.

2.      Specifically, the Debtor requests the entry of two orders:

> (i)      **The Bidding Procedures Order**.  A form of the Bidding Procedures Order is attached as **Exhibit A**, and will, *inter alia*:

- authorize the Debtor to enter into the APA with the Prospective Purchaser, subject to higher or otherwise better bids;
- approve the Bidding Procedures, in a form substantially similar to the Bidding Procedures attached to the Bidding Procedures Order;
- approve the notice of the sale (the "**Sale Notice**") in a form substantially similar to the Bidding Procedures attached to the Bidding Procedures Order;
- approve the Break-Up Fee; and
- set an auction date (the "**Auction**") and a hearing date to approve the sale of the Assets (the "**Sale Hearing**").

(ii)    **The Sale Order**. A form of the Sale Order is attached as **Exhibit B**, and will, *inter alia*,

- approve the sale of the Assets free and clear of all interests, including all liens, claims and encumbrances;
- authorize the assumption and assignment of certain Agreements; and
- approve certain related relief.

## II.

## JURISDICTION

3.    This Court has jurisdiction over the Motion pursuant to 28 U.S.C. §§ 1334 and 157(b). This is a "core" proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) and (O).

4.    Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## III.

## BACKGROUND

5.    On January 5, 2009 (the "**Filing Date**"), the Debtor filed a voluntary petition for relief pursuant to chapter 11 of the Bankruptcy Code.  Since the Filing Date, the Debtor has remained in possession of its assets and continued to manage its business as a debtor-in-possession pursuant to §§ 1107 and 1108 of the Bankruptcy Code.

6.    On January 21, 2009, the official committee of unsecured creditors (the "**Committee**") was constituted by the United States Trustee and has retained counsel and a financial advisor.

7.    A detailed description of the Debtor's business and facts precipitating the filing of the Debtor's Chapter 11 proceeding is set forth in the Declaration of Hyun Jong  "HJ" Nam (the "**Nam Affidavit**") submitted in support of the Debtor's various "First Day Motions."  Those facts are incorporated herein by reference.

8.    As set forth in the Nam Affidavit, the Debtor is a retailer of modern urban ready-to-wear apparel and accessories.  As of the Filing Date, the Debtor operated 64 retail stores in shopping malls throughout eight Eastern and two Western States and had annual sales in excess of $100 million.

{00119340;7}3

A.      **Exit Strategy**

9.      Shortly after the Debtor's chapter 11 filing, its business started to decline.  Relationships

with business partners, vendors, clients, and employees were adversely affected by speculation regarding

the Debtor's continued viability in light of the bankruptcy filing.  Further the extraordinary expense of

simply being in Chapter 11 adversely effected the Debtor's profitability.

10.     The Prospective Purchaser expressed early interest in making a bid for the business of the

Debtor.  The Prospective Purchaser will be owned by Kenny Khym: 49%, David Khym: 41% and

Esther Khym (daughter of David Khym): 10%.  Kenny Khym is the managing member of New Deal

LLC.  David Khym , who is Kenny Khym's brother, is a principal of Wicked Fashions, Inc., a major

supplier of the Debtor.  Kenny Khym is currently the sole shareholder of the Debtor and is also President

of the Debtor.

11.     With the assistance of both the Debtor's and Committee's financial advisors, the

parameters of a deal were worked out that provided the creditors with value well in excess of a

liquidation.  Indeed, as described below, **subject to certain adjustments, general unsecured creditors**

**are guaranteed a 14% distribution.**  The parties have since entered into the APA, which both the

Debtor and the Committee determine to be the best available "stalking horse" bidder for the Debtor's

business, based on its proposed purchase price and the other terms set forth in the APA.

12.     Further, Bank of America, N.A., successor-by-merger to Fleet National Bank ("**BofA**"),

holds an allowed secured claim against the Debtor in the approximate amount of $3,264,446.59 as of the

Petition Date, together with post-petition interest, any attorneys' fees and costs incurred by BofA and  any

reimbursement obligations of Debtor to BofA in connection with that certain Letter of Credit No.

64131023 in the amount of $95,062.50 as of the Petition Date, together with post-petition interest, and

attorneys' fees and costs incurred by BofA (the "**BofA Secured Claim**"), as a result of certain loans and

other financial accommodations provided to the Debtor by BofA prior to, and following, the filing of this

bankruptcy case, which claim includes principal, interest that has accrued prior to, and following, the

filing of this bankruptcy case.

13.     Notwithstanding anything to the contrary set forth in this Motion, the APA or the Sale

Order, the BofA Secured Claim is: (a) secured by BofA's duly-perfected first priority security interests

in, and liens on, *inter alia*, all of Debtor's assets, including but not limited to the Acquired Assets and the

Retained Assets, as such terms are defined in and construed under the APA (the "**BofA Pre-Closing**

**Liens**"), and BofA has, and will continue to have, after entry of this Order and until payment in full of the

BofA Secured Claim, legal, valid, allowed, enforceable, non-avoidable and continuing duly-perfected first

priority security interests in and liens on (i) substantially all of the Debtor's assets, including but not

limited to the Acquired Assets and the Retained Assets, and (ii) the proceeds of the sale, including, but

not limited to, the Plan Fund, as such term is defined in and construed under the APA (the "**BofA Post-**

**Closing Liens**"), and no disbursements from or adjustments to the Plan Fund shall be made until the

BofA Secured Claim has been paid in full; (b) an allowed, fixed, legal, valid, binding, and enforceable

claim against the Debtor and its estate; and (c) not subject to any contest, objection, recoupment, defense,

counterclaim, offset, claim of subordination, claim of re-characterization, claim of avoidance of any

nature, attack or challenge under the Bankruptcy Code, other applicable non-bankruptcy law, or

otherwise.

14.     At the Closing, the BofA Secured Claim, in an amount to be set forth in an agreed upon

payoff letter from BofA to the Debtor (the "**Payoff Letter**"), shall be paid in full via wire. The Payoff

Letter shall be provided to counsel for the Debtor, counsel for the Committee and counsel for the

Purchaser no less than three (3) days prior to the Closing. Upon payment in full of the BofA Secured

Claim as set forth herein, BofA shall promptly release the BofA Pre-Closing Liens and the BofA Post-

Closing Liens .

**B.**     **The Need For A Prompt Sale of the Assets**

15.     The Debtor, the Prospective Purchaser and the Committee all believe that if the business

is sold in the near future, key business partners, vendors, and employees will re-commit to doing business

with the Debtor and provide it with the stability it needs to continue as a viable going concern. However, absent near term certainty that the Debtor will be sold, the ability to revive these key relationships may be permanently damaged, thus causing a significant loss of value and irreparable harm to the estate of the Debtor. As a result, the Debtor, the Prospective Purchaser and the Committee all believe that unless the Sale to the Prospective Purchaser (or the Successful Bidder, as defined below) is consummated expeditiously, there will be further deterioration in the value of the Debtor which will lower the potential recovery for creditors.

C.     **The Proposed Sale**

16.     The APA is attached hereto as **Exhibit C.** If the Debtor does not receive a higher or otherwise better offer for the sale of substantially all of the assets of the Debtor, the Debtor intends to request that the Court enter an order approving the APA and the sale of substantially all of the assets of the Debtor to the Prospective Purchaser.

17.     The APA includes the following salient provisions:[1]

a.     Purchased Assets:  Substantially all of the Debtor's assets, including:

- All of the Debtor's inventory, furniture, fixtures and equipment at all stores, offices and warehouses and all accounts receivable, vehicles and intellectual property;

- All of the Debtor's cash and cash equivalents;

- No less than twenty of the Debtor's non-residential real property leases; and

- Any and all preference claims against creditors and any and all other claims and potential claims that the Debtor or its estate may have, *which claims shall be released and waived.*

b.     Purchase Price:

- **Subject to the Professional Fee Adjustment, a guaranteed fourteen percent (14%) distribution to general unsecured creditors;**

---

[1] A copy of the APA, and papers relating to this Sale Motion are available at http://cases.administarllc.com/AAO. The current version of the APA is unexecuted and a fully executed version will provided to the Court as soon as practicable. To the extent there are any inconsistencies between the summary description of the APA contained herein and the terms and conditions of the APA, the terms of the APA shall control. Capitalized terms used but not defined in this summary shall have the meanings given to them in the APA

- a waiver of any and all claims held by Wicked Fashions, Inc. and Kenny Khym against the Debtor and its estate;[2] and

- amounts payable in order to cure any defaults existing as of the date of assumption in respect of any leases or contracts assumed by the Debtor and assigned to the Prospective Purchaser.

c.    <u>Guaranty</u>:  The Prospective Purchaser shall satisfy all allowed secured, priority and administrative claims to the extent the Debtor does not have sufficient cash to pay such claims.

d.    <u>Break-up Fee</u>:  If the Debtor sells the Assets to a Successful Bidder other than the Prospective Purchaser, the Debtor shall, in certain circumstances, pay to the Prospective Purchaser a Break-Up Fee in the amount of $250,000.

e.    <u>Transition Services</u>:  The Prospective Purchaser will provide the Debtor, at no cost to the Debtor, with various transition services from and after the Closing Date for the purpose of concluding the bankruptcy case.

f.    <u>Bankruptcy Court Approval</u>:  The APA is subject to Bankruptcy Court approval.

18.    In order to comply with the recently promulgated General Order adopting guidelines for the sale of estate property in a Chapter 11 case the Debtor makes the following highlighted disclosures:

| Category | Provision Contained? | Location of Provision | Justification |
|---|---|---|---|
| Sale to Insider | Yes. | Described in this Application | Kenny Khym is the sole shareholder and chief executive officer of the Debtor and Prospective Purchaser.  The primary steps taken to insure fairness was to actively involve the Committee in the entire sales process. |
| Releases | Yes. | APA, Section 2.3 | Only a limited amount of liabilities are being assumed by the Prospective Purchaser. |
| Closing and Other Deadlines | Yes. | APA, Section 3.4 | The closing must occur before May 31, 2009. |
| Good Faith Deposit | Yes. | APA, Section 3.2.1 and 3.2.2 | The Debtor and the Committee required a deposit, which the Prospective Purchaser will forfeit under certain circumstances if it does not consummate the |

---

[2]    Under the APA, Kenny Khym and Wicked Fashions, Inc. ("**Wicked**") are waiving their claims against the Debtor.  **Those claims will <u>not</u> be waived in the event the Prospective Purchaser is not the ultimate purchaser of the Assets.**

| Category | Provision Contained? | Location of Provision | Justification |
|---|---|---|---|
| | | | transaction. |
| Record Retention | Yes. | APA, Section 6.4.2 | The Prospective Purchaser will allow unfettered access by the Debtor to the Debtor's books and records in order to conclude the Bankruptcy Case. |
| Sale of Avoidance Actions | Yes. | APA, Section 2.2.12 | The Debtor, the Committee and the Prospective Purchaser all required releases of avoidance actions as part of the transaction. |
| Requested Findings as to Successor Liability. | Yes. | | The Prospective Purchaser is purchasing the Debtor's Assets and will not consummate the transaction if it was liable as a successor of the Debtor. |
| Sale Free and Clear of Liens | Yes. | APA, Section 2.1 | The Prospective Purchaser is purchasing the Debtor's Assets in bankruptcy and will not consummate the transaction if it was not purchasing such Assets "free and clear." |
| Relief from Bankruptcy Rule 6004(h) | Yes. | Proposed Sales Order | Time is of the essence given the Prospective Purchaser's need to purchase goods for the back to school season. |

**D.    Proposed Bidding Procedures**

19.    The salient terms of the proposed Bidding Procedures are as follows:[3]

- **Potential Bidders.** Any person who wishes to participate in the Bidding Process (a "**Potential Bidder**") must become a Qualified Bidder. As a prerequisite to becoming a Qualified Bidder, a Potential Bidder, other than the Purchaser, must deliver (unless previously delivered) to the Debtor and the Committee:

    (i)    an executed confidentiality agreement in a form acceptable to the Debtor;

---

[3]    To the extent there are any inconsistencies between the description of the Bidding Procedures contained herein and the terms and conditions of the Bidding Procedures, the terms of the Bidding Procedures control. Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Bidding Procedures.

(ii)    current audited financial statements of the Potential Bidder, or, if the Potential Bidder is an entity formed for the purpose of acquiring the Assets, current audited financial statements of the equity holders of the Potential Bidder; and

(iii)    a preliminary (non-binding) written proposal regarding:

    (a)    the purchase price range;

    (b)    any Assets expected to be excluded;

    (c)    the structure and financing of the transaction (including, but not limited to, the sources of financing of the Purchase Price (as defined in the APA) and the requisite deposit;

    (d)    any conditions to closing that the Prospective Purchaser may wish to impose in addition to those set forth in the APA; and

    (e)    the nature and extent of additional due diligence it may wish to conduct and the date by which such due diligence will be completed.

A Potential Bidder who delivers the documents described in the previous subparagraphs above and whose financial information and credit-quality support or enhancement demonstrate the financial capability of such Potential Bidder to consummate the Sale, if selected as a successful bidder, and who the Debtor, in consultation with the Committee, determine (based on availability of financing, experience, and other considerations) to be able to consummate the Sale within the time frame provided by the APA shall be deemed a "**Qualified Bidder**."

- **Due Diligence**. The Debtor shall afford each Qualified Bidder due diligence access to the Assets on the terms set forth in the Bidding Procedures.

- **Bid Deadline**: A Qualified Bidder (other than the Purchaser) who desires to make a bid shall deliver written copies of its bid on or before **11:00 a.m. (prevailing Eastern time) on May [15][4], 2009 (the "Bid Deadline")**.

- **Bid Requirements**. All bids must include the following documents:

    (i)    a letter stating that the bidder's offer is irrevocable for the period set forth in the Bidding Procedures;

    (ii)    an executed copy of the APA marked to show amendments and modifications to the APA, purchase price, and proposed schedules;

    (iii)    a good faith deposit of twenty percent (20%) of the aggregate bid amount (the "**Good Faith Deposit**"); and

    (iv)    satisfactory written evidence of a commitment for financing or other ability to consummate the proposed transaction.

- **Qualified Bids.** To be deemed a "**Qualified Bid**" a bid must be received by the Bid Deadline and, among other things:

    (i)    be on terms and conditions (other than the amount of the consideration and the particular liabilities being assumed) that are substantially similar to, and not materially more burdensome or conditional to Debtor, than those contained in the APA;

---

[4]    Bracketed dates in this Motion refer to the dates which the Debtor, Prospective Purchaser and the Committee have suggested.

    (ii)     must not be contingent on obtaining financing or the outcome of unperformed due diligence or board approval;

    (iii)    must provide for the same return to general unsecured creditors under the APA, including the claims of Kenny Khym and Wicked, plus an additional $300,000;[5]

    (iv)    provide evidence of adequate assurance of future performance;

    (v)     provide for payment of the Break-Up Fee to the Prospective Purchaser;

    (vi)    confirm that it has not engaged in any collusion with respect to the bidding or the sale; and

    (vii)   include a commitment to consummate the purchase of the Purchased Assets within not more than five days after entry of a Bankruptcy Court order approving such purchase.

- **Auction.** If the Debtor receives at least one Qualified Bid in addition to the APA, the Debtor will conduct an auction (the "**Auction**") for the Assets at **2:00 a.m. (prevailing Eastern time) on May [18], 2009** at the offices of Ballon Stoll Bader & Nadler, P.C., 729 Seventh Avenue ●17th Floor, New York, NY 10019.

20.     In order to comply with the recently promulgated General Order adopting guidelines for the sale of estate property in a Chapter 11 case the Debtor makes the following highlighted disclosures.

(All provisions are contained in Bidding Procedures):

| Category | Provision Contained? | Justification |
|---|---|---|
| Provisions Governing Qualification of Bidders | Yes. | It is the Debtor's intent to insure that only serious bidders undertake the considerable disruption of management attendant to due diligence. |
| Provisions Governing Qualified Bids | Yes. | It is the Debtor's intent to insure that only serious bidders participate in the bidding process. |
| Provisions Providing Bid Protections to "Stalking Horse" or Initial Bidder | Yes. | The Prospective Purchaser would not enter into the APA without a Break-Up Fee. |
| Closing with Alternative Backup Bidders. | Yes. | This is consistent with the Debtor's goal to maximize value for the estate. |

21.     The Debtor believes that the Bidding Procedures provide a fair and appropriate framework for selling the Assets and will enable the Debtor, with assistance from the Committee and their respective financial advisors, to review, analyze and compare all bids received to determine which

---

[5]    Under the APA, Kenny Khym and Wicked Fashions, Inc. ("**Wicked**") are waiving their claims against the Debtor and its estate. Those claims will **not** be waived in the event the Prospective Purchaser is not the ultimate purchaser of the Assets.

bids are in the best interests of the Debtor's estate and creditors. The Bidding Procedures provide parties

with a reasonable opportunity to participate in a competitive bidding process.

**E.**     **Assumption and Assignment of the Agreements**

22.     Pursuant to the APA, the Debtor seeks to assume and assign certain of its executory

contracts and unexpired non-residential real property leases to the Prospective Purchaser (each, an

"**Agreement**" and collectively, the "**Agreements**").  No later than three (3) days after the entry of the

Bidding Procedures Order, the Debtor proposes to (i) file with the Court and serve on all nondebtor

parties to the Agreements a notice (the "**Cure Notice**"), substantially in the form annexed to the Bidding

Procedures Order, of the cure amount necessary to assume the applicable Agreement (the "**Cure**

**Amount**"); and (ii) serve on each counter-party to an Agreement to be assumed and assigned an Adequate

Assurance Package.

23.     The Debtor proposes that the nondebtor party to the Agreement have until **May [19],**

**2009 at 5:00 p.m.** to object or respond to the Cure Amount and must state in its objection with specificity

what cure amount is required (with appropriate documentation in support thereof).

24.     If no objection is timely filed and received, then the assumption and assignment should

be authorized and the cure amounts set forth in the Cure Notice binding upon the non-debtor party to the

Agreement for all purposes, constitute a final determination of total cure amounts required to be paid by

the Debtor or the Prospective Purchaser in connection with the assignment to the Successful Bidder and

the nondebtor party to the Agreement be forever barred from asserting any other claims against the

Debtor, the Prospective Purchaser, or the Successful Bidder (as appropriate), or the property of either of

them, as to the Cure Amount.

## IV.

## PROCEDURAL RELIEF

25.     THE DEBTOR EXPRESSLY RESERVES THE RIGHT TO MODIFY THE RELIEF

REQUESTED IN THIS SALE MOTION PRIOR TO OR AT THE APPLICABLE HEARINGS,

INCLUDING THE PROPOSED BIDDING PROCEDURES.

### A.    **The Bidding Procedures Should be Approved**

26.    In order to facilitate an orderly sale of the Assets and assumption of the Assumed Liabilities, the Debtor request that the Court: (i) approve the Bidding Procedures to solicit competing bids for the Assets and Assumed Liabilities; (ii) establish certain notice procedures and objection, bid and cure statement deadlines and schedule the Auction and the Sale Hearing; and (iii) approve the Break-Up Fee for the Prospective Purchaser. Moreover, the Debtor requests that the Court authorize the Debtor to enter into the APA with the Prospective Purchaser, subject to higher and better offers.

### B.    **Service of this Motion and Related Sale Pleadings**

27.    To the extent service is not effectuated pursuant to the Court's CM/ECF filing, the Debtor proposes to serve this Sale Motion and all supporting papers, by overnight delivery, facsimile or electronic mail upon the Core Service List.

28.    The Debtor proposes to serve the Sale Notice, which, among other things, specifies the deadline to submit a bid for the Assets, the time and place of the Auction, the terms and conditions of the Sale, and the deadline for filing any objections substantially in the form annexed to the Bidding Procedures Order on (i) the United States Trustee for the District of New Jersey, (ii) counsel to Bank of America, N.A., (iii) all entities known or reasonably believed to have asserted a lien, encumbrance, claim or other interest in the Assets that the Debtor seeks to sell, (iv) the Master Service List and (v) all parties that have either expressed an interest in purchasing the Debtor's Assets or who the Debtor believes may express an interest in purchasing such Assets (the parties listed in (i) –(v) shall be referred to as the "**Notice Parties**").

29.    The Debtor submits that service of this Sale Motion, including all exhibits thereto, on the Core Service List and service of the Sale Notice on the Notice Parties complies with Bankruptcy Rule 2002(c) and includes information on the Bidding Procedures and Sale necessary to enable interested parties to participate in the Auction and the Sale Hearing.

30.    The Debtor submits that distribution of the Sale Motion to all of the creditors and equity

security holders of the Debtor's estate, absent their specific request for a copy of same, would be unduly

burdensome and time consuming and would significantly and unnecessarily increase the costs incurred by

the Debtor's estate, which cost should be kept to a minimum for the ultimate benefit of the Debtor's

creditors.

31.    The Debtor respectfully request that this Court authorize this limited service pursuant to

Rule 2002(m).

32.    **The Supplement.** The Debtor proposes to file with this Court a supplement to the Sale

Motion (the "**Supplement**") to report to the Court the results of the Auction within one business day of

the conclusion of the Auction *if a Qualified Bidder other than Prospective Purchaser is the "Successful*

*Bidder"* (as defined in the Bidding Procedures Order).

33.    The Supplement will identify, as applicable, among other things, (i) the proposed buyer

of the Assets, if different from the Prospective Purchaser, (ii) the Assets to be acquired, (iii) the

consideration to be paid by the Successful Bidder for the Assets, (iv) the material terms upon which such

purchase is based, and (v) any material Agreements to be assumed and assigned to the Successful Bidder.

In addition, the Debtor will annex to the Supplement, as exhibits, copies of agreements entered into by the

Debtor and the Successful Bidder (if different from the APA) and copies of the buyer's adequate

assurance information.

### C.    The Break-Up Fee Should Be Approved

34.    Approval of break-up fees, expense reimbursements and other forms of bidding

protections in connection with the sale of a debtor's property pursuant to § 363 of the Bankruptcy Code is

an established practice in chapter 11 cases. *See In re Ryan*, 261 B.R. 867, 870 (Bankr. E.D. Va. 2001);

*Gey Assocs. v. 310 Assocs.* (*In re 310 Assocs.*), 346 F.3d 31, 33-34 (2d Cir. 2003); *Official Comm. of*

*Subordinated Bondholders v. Integrated Res., Inc.* (*In re Integrated Res., Inc.*), 147 B.R. 650, 662-63

(S.D.N.Y. 1992), appeal dismissed, 3 F.3d 49 (2d Cir. 1993).  Agreements to provide break-up fees and

similar bidding protections are designed to compensate a potential acquirer who serves as a catalyst that may attract higher and better offers, and are often approved in bankruptcy cases to encourage bidding. *See In re Ryan*, 261 B.R. at 870. Specifically, break-up fees (i) attract or retain a potentially successful bid, (ii) establish a bid standard or minimum for other bidders to follow, and (iii) attract additional bidders. *In re Integrated Res., Inc.*, 147 B.R. at 661-62. Break-up fees can be advantageous to both buyers and sellers by encouraging bidding and helping to ensure that sellers receive the highest or otherwise best offer while also compensating the buyer for the risk of being outbid. *See In re Ryan*, 261 B.R. at 870. "It has become increasingly common in § 363 sales of significant portions of an estate's assets for the prospective buyer to demand a break-up fee or other protection in the event that the sale is not consummated." *3 Collier on Bankruptcy* §§ 363.03[7] (15th rev. ed. 2002).

35.     Break-up fees are allowed as an administrative expense claim against the estate if they satisfy the standard of § 503(b)(1) of the Bankruptcy Code. *In re Tropea*, 352 B.R. 766, 768 (Bankr. N.D.W. Va. 2006). Thus, the break-up fee must reflect the actual and necessary cost of preserving the estate. *See* 11 U.S.C. § 503(b)(1); *see also In re Tropea*, 352 B.R. at 768. In *Calpine Corp. v. O'Brien Environmental Energy, Inc. (In re O'Brien Environmental Energy, Inc.*), 181 F.3d 527 (3d Cir. 1999), the United States Court of Appeals for the Third Circuit expanded on the application of the § 503(b)(1) standard to break-up fees. The Third Circuit Court of Appeals held that even though bidding incentives are measured against a business judgment standard in non-bankruptcy transactions, the administrative expense provisions of § 503(b) of the Bankruptcy Code govern in the bankruptcy context. Accordingly, to be approved, bidding incentives must provide some postpetition benefit to the debtor's estate. *See id.* at 533; *see also Corradino v. Lamb (In re Lamb)*, 2002 WL 31508913, at *2 (Bankr. D. Md. 2002) (implicitly adopting the administrative expense standard set forth in *O'Brien*).

36.     The *O'Brien* Court identified at least two instances in which bidding incentives may provide benefit to the estate. First, benefit may be found if "assurance of a break-up fee promoted more competitive bidding, such as by inducing a bid that otherwise would not have been made and without

which bidding would have been limited." *In re O'Brien Envtl. Energy*, 181 F.3d at 537. Second, when

the availability of bidding incentives induce a bidder to research the value of the debtor and submit a bid

that serves as a minimum or floor bid on which other bidders can rely, "the bidder may have provided a

benefit to the estate by increasing the likelihood that the price at which the debtor is sold will reflect its

true worth." *Id.*

37.    The proposed Break-Up Fee is appropriate under § 503 of the Bankruptcy Code as the

Break-Up Fee is fair and reasonable in amount, particularly in view of the efforts that have been expended

by the Prospective Purchaser. Moreover, the Break-Up Fee will enable the Debtor to secure an adequate

floor for the Auction and, thus, insist that competing bids be materially higher or otherwise better than the

terms of the APA.

38.    In sum, the Debtor's ability to offer the Break-Up Fee, has enabled it to secure a sale of

the its Assets to a contractually-committed bidder at a price that it believes to be fair while, at the same

time, providing it with the potential of even greater benefit to the estate through an auction process. Thus,

the Break-Up Fee should be approved.

## PART II

## SALE APPROVAL

### A.    Sound Business Judgment Exists to Support the Sale

39.    The Debtor submits that ample authority exists for the approval of the Sale of the Assets.

In accordance with Bankruptcy Rule 6004(f)(1), sales of property rights outside the ordinary course may

be by private sale or public auction. The Debtor has determined the sale of the Assets by public auction

will enable it to obtain the highest or best offer for the Assets and is, therefore, in the best interests of the

Debtor and its estate and creditors. Section 363(b)(1) of the Bankruptcy Code provides, in relevant part,

that a debtor in possession, "after notice and a hearing, may use, sell, or lease, other than in the ordinary

course of business, property of the estate." 11 U.S.C. § 363(b)(1). Under § 363(b) of the Bankruptcy

Code, approval of a sale is appropriate if the court finds the transaction has a sound business purpose or

represents a reasonable business judgment on the part of the debtor. *See WBQ P'ship v. Va. Dep't of Med.*

*Assistance Servs.* (*In re WBQ P'ship*), 189 B.R. 97, 102 (Bankr. E.D. Va. 1995) (adopting "sound

business purpose" test for § 363(b) sales as set forth in *In re Lionel Corp.*); *In re W.A. Mallory Co.*, 214

B.R. 834, 836-37 (Bankr. E.D. Va. 1997) (noting that court follows the "sound business purpose" test

when examining § 363(b) sales).

40.     Although the Bankruptcy Code does not articulate the standard for approving a sale of

assets (other than requiring notice and a hearing), the United States Court of Appeals for the Third Circuit

in the seminal case of *In re Abbotts Dairies of Pennsylvania, Inc.*, 788 F.2d 143, 149-50 (3d Cir. 1986)

interpreted § 363(b) to require a finding by the Bankruptcy Court that the acquirer of a debtor's assets be

a good faith purchaser.  The Third Circuit construed the "good faith purchaser" standard to mean one who

purchases "in good faith" and for "value." *Abbotts Dairies*, 788 F.2d at 147.

41.     The Third Circuit in *Abbotts Dairies* then analogized the bona fides of a § 363(b)

purchaser to a buyer at a judicial sale:

> The requirement that a purchaser act in good faith . . . speaks to the
> integrity of his conduct in the course of the sale proceedings.  Typically,
> the misconduct that would destroy a purchaser's good faith status at a
> judicial sale involves fraud, collusion between the purchaser and other
> bidders or the trustee, or an attempt to take grossly unfair advantage of
> other bidders.

*Abbotts Dairies*, 788 F.2d at 147 (*quoting Rock Industries*, 572 F.2d at 1198).  Finally, the Court noted

that "[t]raditionally, courts have held that '[f]air and valuable consideration is given in a bankruptcy sale

when the purchases pays 75% percent of the appraised value of the assets.'" *Abbotts Dairies*, 788 F.2d at

149; *In re Karpe,* 84 B.R. 926, 933 (Bankr. M.D. Pa. 1988).

34.     In addition to the *Abbotts Dairies* requirements, which the Debtor clearly has satisfied,

courts consistently require debtors-in-possession to establish a "sound business purpose" to sell any or all

their assets before confirmation of a reorganization plan. *In re Lionel Corp.*, 722 F.2d 1063 (2d Cir.

1983); *In re Delaware & Hudson Railway Co.*, 124 B.R. 169, 175-76 (D. Del. 1991); *In re Titusville

Country Club*, 128 B.R. 396, 399 (Bankr. W.D. Pa. 1991); *In re Sovereign Estates,* Ltd., 104 B.R. 702,

704 (Bankr. E.D. Pa. 1989); *In re Conroe Forge & Manufacturing Corp.*, 82 B.R. 781, 783-86 (Bankr.

W.D. Pa. 1988); *In re Industrial Valley Refrigeration & Air Conditioning Supplies, Inc.*, 77 B.R. 15, 21

(Bankr. E.D. Pa. 1987). Courts have developed the following non-exclusive list of factors to consider in

determining whether a sound business purpose exists:

(i)      Sound business reason for the sale;

(ii)     Accurate and reasonable notice;

(iii)    Proportionate value of the asset to the estate as a whole (fair and reasonable);

(iv)     The amount of elapsed time since the filing;

(v)      The likelihood that a plan of reorganization will be proposed and confirmed in the near future;

(vi)     The effect of the proposed disposition on the future plan;

(vii)    The amount of proceeds to be obtained from the sale versus the appraised value of the property sold; and

(viii)   Whether the asset is decreasing or increasing in value.

*Lionel Corp.*, 722 F.2d at 1071; *Delaware & Hudson Railway*, 124 B.R. at 176; *In re Weatherly Frozen*

*Food Group, Inc.*, 149 B.R. 480, 483 (Bankr. N.D. Ohio 1992). Courts generally show deference to a

debtor's decisions when applying the business judgment standard. *In re Global Crossing, Ltd.*, 29 B.R.

726, 744 n. 58 (Bankr. S.D.N.Y. 2003). Deference is inappropriate only if such business judgment is "so

manifestly unreasonable that it could not be based on sound business judgment, but only on bad faith, or

whim or caprice." *In re Richmond Metal Finishers*, Inc., 756 F.2d 1043, 1047 (4th Cir. 1985)

        42.      Based upon its analysis, the Debtor, with the consent of the Committee, has concluded

that the Sale of the Assets in accordance with the Bidding Procedures will maximize recoveries to the

Debtor's estate. As to the first element of the "sound business purpose" test, the Debtor's decision to

conduct the Sale through an auction process is an exercise of sound business judgment. A debtor's

showing of a sound business purpose need not be unduly exhaustive but, rather, a debtor is "simply

required to justify the proposed disposition with sound business reasons." *In re Baldwin United Corp.*, 43

B.R. 888, 906 (Bankr. S.D. Ohio 1984). Whether or not there are sufficient business reasons to justify a

transaction depends upon the facts and circumstances of each case. *See In re Lionel Corp.*, 722 F.2d at

1071. The Debtor proposes to sell the Assets to the Prospective Purchaser pursuant to the APA, or to

another Qualified Bidder. In either case, the net effect of the transaction, if approved, will be that the

Debtor will have divested itself of the Assets via a transaction that the Debtor, and the Committee,

believes will benefit the Debtor's creditors and other parties in interest.

43.      Second, the Sale has been proposed in good faith through arm's length negotiations under

the careful scrutiny of the Committee. "A negotiation conducted at arm's length helps to insure that the

agreed price ultimately will be fair and reasonable." *In re WBQ P'ship*, 189 B.R. at 103. The terms of the

APA were negotiated in good faith and the Committee was heavily involved in every step of the

negotiations.

44.      Third, the Debtor intends to provide all interested parties with adequate and reasonable

notice of the Auction and Sale Hearing. In particular, all parties who previously expressed or may

express any interest in purchasing the Assets will be served with the Sale Notice. In light of the

circumstances, the notice proposed herein is reasonably calculated to provide timely and adequate notice

to the Debtor's major creditor constituencies, those parties most interested in this case, those parties

potentially interested in bidding on the Assets and others whose interests are potentially implicated by the

Sale.

45.      Fourth, the sale of the Assets will be subject to competing bids, thereby enhancing the

Debtor's ability to receive the highest or otherwise best value for them. Consequently, the fairness and

reasonableness of the consideration to be received by the Debtor will ultimately be demonstrated by a

"market check" through the auction process, which is the best means for establishing whether a fair and

reasonable price is being paid.

**B.       The Sale is Proposed in "Good Faith" Under Section 363(m) of the <u>Bankruptcy
Code</u>**

46.      The Debtor requests that the Court find that the Prospective Purchaser is entitled to the

benefits and protections provided by § 363(m) of the Bankruptcy Code in connection with the Sale.

Section 363(m) of the Bankruptcy Code provides, in pertinent part:

> The reversal or modification on appeal of an authorization under subsection (b) . . . of this section of a sale . . . of property does not affect the validity of a sale . . . under such authorization to an entity that purchased . . . such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale . . . were stayed pending appeal.

11 U.S.C. § 363(m).

47.    Section 363(m) of the Bankruptcy Code thus protects purchasers of assets sold pursuant to § 363 of the Bankruptcy Code from the risk that they will lose their interest in the purchased assets if the order allowing the sale is reversed on appeal. Although the Bankruptcy Code does not define "good faith purchaser," the Fourth Circuit Court of Appeals has "adopt[ed] the traditional equitable definition that has been adopted by various courts of appeal: 'one who purchases the assets for value, in good faith, and without notice of adverse claims.'" *Willemain v. Kivitz*, 764 F.2d 1019, 1023 (4th Cir. 1985) (citations omitted). To constitute lack of good faith, a party's conduct in connection with the sale must usually amount to "fraud [or] collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders." *Id* (*citing In re Rock Indus. Mach. Corp.*, 572 F.2d 1195, 1198 (7th Cir. 1978)); *see also In re Bedford Springs Hotel, Inc.*, 99 B.R. 302, 305 (Bankr. W.D. Pa. 1989); *In re Perona Bros., Inc.*, 186 B.R. 833, 839 (D. N.J. 1995). Due to the absence of a bright line test for good faith, the determination is based on the facts of each case, concentrating on the "integrity of [an actor's] conduct in the course of the sale proceedings." *In re Pisces Leasing Corp.*, 66 B.R. 671, 673 (E.D.N.Y. 1986) (*quoting In re Rock Indus. Mach. Corp.*, 572 F.2d at 1198).

48.    Here, the Sale of the Assets is in good faith. While Mr. Khym will own a minority interest in the Prospective Purchaser, and is a director and officer of the Debtor, such relationship has been fully disclosed and the Committee has been actively involved in the negotiations with the Prospective Purchaser. Neither Mr. Khym nor the Prospective Purchaser exercised any undo influence in connection with the Debtor's negotiations with the Prospective Purchaser. Moreover, there is no evidence of fraud or collusion in the terms of the Sale, and the Bidding Procedures ensure that the Prospective Purchaser will not be able to exert any undue influence over the Debtor. Accordingly, the Prospective

Purchaser (as well as any purchaser that outbids the Prospective Purchaser in connection with the

Auction) should be deemed "good faith purchasers" and entitled to the protections of § 363(m) of the

Bankruptcy Code.

### C.    The Sale Satisfies the Requirements of Section 363(f) of the Bankruptcy Code

49.    The Debtor requests the authorization to sell the Assets free and clear of all interests,

including but not limited to all liens, claims and encumbrances, that may be asserted in, to or against the

Assets.  In accordance with § 363(f) of the Bankruptcy Code, a debtor in possession may sell property

under § 363(b) "free and clear of any interest in such property of an entity other than the estate" if one of

the following conditions is satisfied:

> (1)    applicable nonbankruptcy law permits sale of such property free and clear of such interest;
>
> (2)    such entity consents;
>
> (3)    such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;
>
> (4)    such interest is in bona fide dispute; or
>
> (5)    such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f); *In re Elliot*, 94 B.R. 343, 354 (E.D. Pa. 1988) (§ 363(f) written in disjunctive; court

may approve sale "free and clear" provided at least one of the subsections is met).  The Debtor expects

that it can satisfy any or all of the second, third and fifth of these requirements.

50.    In order to facilitate the sale of the Assets, the Debtor requires authorization to sell them

free and clear of all interests, including but not limited to all liens, claims and encumbrances, that may be

asserted in, to or against the Assets, with those interests, if any, to attach to the sale proceeds, except to

the extent a buyer agrees to purchase and take title to the Assets subject to any of those interests.

51.    The Debtor has discussed the proposed sale of the Assets with the Bank of America, and

the Bank supports the sale of the Assets to the Prospective Purchaser, subject to higher or better offers at

the Auction.  All liens on the Assets will be satisfied or will attach to the proceeds of sale of the Assets

with the same force, effect and priority as such liens have on the Assets, subject to the rights and

defenses, if any, of the Debtor and any party in interest with respect thereto. Accordingly, the Debtor

submits that the sale of the Assets free and clear of liens, claims and encumbrances satisfies the statutory

prerequisites of § 363(f) of the Bankruptcy Code.

### D.    The Debtor Should Be Authorized to Assume and Assign the Agreements

52.    To facilitate and effect the sale of the Assets, the Debtor also seeks to assume and assign

to Purchaser certain Agreements relating to the Business. Section 365 of the Bankruptcy Code authorizes

a debtor to assume and/or assign its executory contracts and unexpired leases subject to the approval of

the Bankruptcy Court.

> (a)    [T]he trustee, subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor.
>
> (b)
>
> > (1)    If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee—
> >
> > > (A)    cures, or provides adequate assurance that the trustee will promptly cure, such default other than a default that is a breach of a provision relating to the satisfaction of any provision (other than a penalty rate or penalty provision) relating to a default arising from any failure to perform nonmonetary obligations under an unexpired lease of real property, if it is impossible for the trustee to cure such default by performing nonmonetary acts at and after the time of assumption, except that if such default arises from a failure to operate in accordance with a nonresidential real property lease, then such default shall be cured by performance at and after the time of assumption in accordance with such lease, and pecuniary losses resulting from such default shall be compensated in accordance with the provisions of this paragraph;
> > >
> > > (B)    compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and
> > >
> > > (C)    provides adequate assurance of future performance under such contract or lease.
>
> (f)
>
> > (2)    The trustee may assign an executory contract or unexpired lease of the debtor only if—
> > > (A)    the trustee assumes such contract or lease in accordance with the provisions of this section; and
> > > (B)    adequate assurance of future performance by the assignee of such contract or lease is provided, whether or not there has

been a default in such contract or lease.

*See* 11 U.S.C. §§ 365(a), (b)(1) and (f)(2). Accordingly, § 365 authorizes the proposed assumptions and

assignments, as long as the debtor or the assignee cures the defaults under the executory contracts and

unexpired leases and the assignee provides adequate assurance of future performance under the contract

or lease.

53.    The meaning of "adequate assurance of future performance" depends on the facts and

circumstances of each case, but should be given "practical, pragmatic construction." *See Carlisle Homes,*

*Inc. v. Arrari (In re Carlisle Homes, Inc.)*, 103 B.R. 524, 538 (Bankr. D.N.J. 1989); *see also In re Natco*

*Indus., Inc.*, 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) (adequate assurance of future performance does

not mean absolute assurance that debtor will thrive and pay rent); *In re Bon Ton Rest. & Pastry Shop,*

*Inc.*, 53 B.R. 789, 803 (Bankr. N.D. Ill. 1985) ("Although no single solution will satisfy every case, the

required assurance will fall considerably short of an absolute guarantee of performance.").

54.    Among other things, adequate assurance may be given by demonstrating the assignee's

financial health and experience in managing the type of enterprise or property assigned. *In re Bygaph,*

*Inc.,* 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (adequate assurance of future performance is present

when prospective assignee of a lease from debtor has financial resources and has expressed a willingness

to devote sufficient funding to business in order to give it strong likelihood of succeeding; chief

determinant of adequate assurance is whether rent will be paid); *see also In re Peterson's Ltd.*, 31 B.R.

524, 527 (S.D.N.Y. 1983).

55.    The Debtor believes it and the Prospective Purchaser will satisfy all requirements for the

assumption and assignment of the Agreements at or before the Sale Hearing. The evidence will include

substantial capitalization of the Prospective Purchaser. Further, it is an express condition of the Bidding

Procedures that competing bidders submit adequate assurance packages containing sufficient financial

and other information to assess the bidder's compliance with § 365 (the "**Adequate Assurance**

**Packages**"). If a Successful Bidder other than the Prospective Purchaser has the highest or best offer at

the Auction, the Debtor will attach the Adequate Assurance Package for the Successful Bidder to the

Supplement and provide all non-debtor parties to the Agreements with an opportunity to be heard. Thus,

the Debtor respectfully submits that by the conclusion of the Sale Hearing, assumption and assignment of

the selected Agreements should be approved.

       **E.**      **<u>Contractual Anti-Assignment Provisions Are Unenforceable.</u>**

      56.     To assist in the sale of the Assets, the Debtor requests that the Sale Order provide that

certain contractual anti-assignment provisions are unenforceable. Section 365(f)(1) of the Bankruptcy

Code permits a debtor to assign unexpired leases and contracts free from such anti-assignment

restrictions. Specifically, § 365(f)(1) of the Bankruptcy Code provides that:

> (f)
>
>     (1)     Except as provided in subsections (b) and (c) of this section, notwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law, that prohibits, restricts, or conditions the assignment of such contract or lease, the trustee may assign such contract or lease under paragraph (2) of this subsection.

11 U.S.C. § 365(f)(1). Section 365(f)(2) provides safeguards for contract parties incident to the

assumption and assignment of unexpired leases or contracts by requiring a debtor which assumes and

assigns a lease to provide adequate assurance of future performance. *See In re Jamesway Corp.,* 201 B.R.

73, 77-78 (Bankr. S.D.N.Y. 1996) (recognizing "clear Congressional policy of assisting the debtor to

realize the equity in all of its assets," and "Congressional policy favoring the assumption and assignment

of unexpired leases as a means of assisting the debtor in its reorganization or liquidation efforts"); *In re

Brentano's Inc.,* 29 B.R. 881, 882 (Bankr. S.D.N.Y. 1983) (Code section 365 "express[es] a clear

Congressional policy that potentially valuable assets inure to the benefit of a reorganizing debtor.").

      57.     Section 365(f) prohibits three distinct types of anti-assignment provisions: (1) provisions

that "prohibit" the assignment of a lease are unenforceable; (2) provisions that "condition" the ability of a

debtor to assume and assign a lease are stricken; and (3) provisions that seek to "restrict" the ability of a

debtor to assume and assign unexpired leases are not given effect.

58.     Contract parties who seek to restrict a debtor's assignment rights by preserving in their underlying leases or contracts such anti-assignment provisions run counter to the plain language of § 365(f), which provides that assignments may take place for the benefit of creditors:

> Perhaps the most subtle area of section 365(f)(1) concerns clauses that do not categorically forbid assignment but are so restrictive that de facto they do forbid assignment to such an extent that the Code will not enforce them.  Such clauses are often called de facto anti-assignment clause . . .  Courts have also gone to some length to construe a way around clauses that could have an anti-assignment effect.

Collen, *Buying and Selling Real Estate in Bankruptcy*, 27 Real Est. L.J. 10 (1997) 7.06[3].

59.     Courts in this Circuit and others have recognized that contract provisions that have the effect of restricting assignments cannot be enforced.  *See In re Joshua Slocum Ltd.*, 922 F.2d 1081, 1090 (3d Cir. 1990); *In re Rickel Home Centers, Inc.*, 240 B.R. 826, 831-32 (D. Del. 1999), *aff'd, Rickel Home Centers, Inc.*, 209 F.3d 291 (3d Cir. 2000) ("In interpreting Section 365(f), courts and commentators alike have construed the terms to not only render unenforceable lease provisions which prohibit assignment outright, but also lease provisions that are so restrictive that they constitute de facto anti assignment provisions."); *Vornado Realty Trust v. Bradlees Stores, Inc. (In re Bradlees Stores, Inc.)*, No. M47 (LMM) (S.D.N.Y. Feb. 9, 2001); *In re Bradlees Stores Inc.*, Case Nos. 00-16033, 00-16035, and 00-16036 (BRL) (Bankr. S.D.N.Y. March 28, 2001); *In re Boo.com North America, Inc.*, Case No. 00-15123 (JHG), 2000 Banks. LEXIS 1559 (Bankr. S.D.N.Y. Dec. 15, 2000); *In re U.L. Radio Corp.*, 19 B.R. 537 (Bankr. S.D.N.Y. 1982); *see also Crow Winthrop Dev. Ltd. Partnership v. Jamboree LLC (In re Crow Winthrop Operating Partnership)*, 241 F.3d 1121 (9th Cir. 2001).  Similarly, in *In re Mr. Grocer,* the court noted that:

> [the] case law interpreting § 365(f)(1) of the Bankruptcy Code establishes that the court does retain some discretion in determining that lease provisions, which are not themselves ipso-facto anti-assignment clauses, may still be refused enforcement in a bankruptcy context in which there is no substantial economic detriment to the landlord shown, and in which enforcement would preclude the bankruptcy estate from realizing the intrinsic value of its assets.

77 B.R. 349, 354 (Bankr. D.N.H. 1987).

60.     As noted above, the District Court affirmed the bankruptcy court in connection with an appeal in *Bradlees*, in which the District Court expressly upheld the broad scope of § 365(f) of the Bankruptcy Code to invalidate provisions of a debtor's leases (including, without limitation, provisions permitting the landlord to reallocate rent among various of the debtors' leases) that have the *effect* of *chilling* the debtor's ability to assign its leases.  The District Court stated that "[t]he practical effect of the [anti-assignment] provision of the [lease] agreement would not only limit the debtor's ability to realize the intrinsic value of the relevant leases, but would do so relatively severely and that would frustrate the Congressional policy of assisting the debtor in realizing the equity in all of its assets." *Vornado Realty Trust v. Bradlees Stores, Inc. (In re Bradlees Stores, Inc.)*, No. M47 (LMM) (S.D.N.Y. Feb. 9, 2001).

**F.      Relief Under Bankruptcy Rules 6004(h) and 6006(d)**

61.     Pursuant to Bankruptcy 6004(h), all orders authorizing the sale of assets pursuant to § 363 of the Bankruptcy Code are automatically stayed for ten days after entry of the order, unless a court orders otherwise.  The purpose of Bankruptcy Rule 6004(h) is to provide sufficient time for an objecting party to request a stay pending appeal before the order can be implemented.

62.     The Court may dispense with the ten-day period to allow a sale or transaction to close immediately, particularly where there have been no objections to the sale procedure.  The Prospective Purchaser must immediately begin placing orders for the upcoming back to school season.  If the Sale Closing is delayed for ten days, the Prospective Purchaser may not be able to properly stock its stores with inventory.  Accordingly, in view of the Prospective Purchaser's need to close on this sale immediately, the Debtor requests that upon approval of the Sale at the Sale Hearing, the ten day period pursuant to Bankruptcy Rule 6004(h) be waived by the Court.  The Debtor likewise requests a waiver of the ten day stay embodied in Bankruptcy Rule 6006(d).

63.     As no novel issue of law is raised and the relevant authorities relied upon by the Debtor are set forth herein, the Debtor respectfully requests that the requirement of the filing a brief be waived.

64.     No prior application for the relief requested herein has been made to this or any

other court.

**WHEREFORE**, the Debtor respectfully requests that the Court enter the Bidding

Procedures Order and the Sale Order and such other relief as the Court deems just and appropriate under

the circumstances.

Dated:      New York, New York
            April 30, 2009

                              Respectfully submitted,

                              BALLON STOLL BADER & NADLER, P.C.


                              By:_____
                                      Dwight Yellen (DY 6547)
                                      Michael J. Sheppeard (MS 9115)

*Attorneys for Debtor and Debtor-in-Possession*
Against All Odds USA, Inc.
729 Seventh Avenue – 17th Floor
New York, NY 10019
                  +
505 Main Street
Hackensack, NJ 07601
212.575-7900
Fax 212.764-5060

### UNSWORN DECLARATION
### AND VERIFICATION
### UNDER PENALTY OF PERJURY

I, HYUN JONG NAM , declare, certify, verify and/or state under penalty of perjury of the laws of the United States of America, pursuant to 28 U.S.C. §1746, as follows:

1.      I am the Chief Financial Officer of Against All Odds USA, Inc. (the "Debtor"). As such, I have full knowledge of the facts set froth herein, and am duly authorized to make this Application on the Debtor's behalf.

2.      I have read the foregoing Verified Application and certify that the statements contained therein are true based upon my personal knowledge, information and belief.

3.      I am aware that if any of the factual statements contained in the Verified Application are willfully false, I am subject to punishment.

Dated:        New York, New York
              April 29, 2009

                                                    _____
                                                    HYUN JONG NAM

{00117087;1}